MICHAEL JAY GREEN     4451
841 Bishop Street, Suite 2201
Honolulu, Hawaii 96813
Telephone: (808) 521-3336
Fax: (808) 566-0347

GLENN H. UESUGI     4865
841 Bishop Street, Suite 2201
Honolulu, Hawaii 96813
Telephone: (808) 521-3336
Fax: (808) 566-0347

Attorneys for Plaintiff
THOMAS I. HO

FIRST CIRCUIT COURT
STATE OF HAWAII
FILED

2016 JUL -1  AM 11: 23

J. KUBO
CLERK

## IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

## STATE OF HAWAII

| | |
|---|---|
| THOMAS I. HO, | CIVIL NO. ___16-1-1266-07___  ECN. |
| Plaintiff, | [Non-Motor Vehicle Tort] |
| vs. | COMPLAINT; DEMAND FOR JURY TRIAL; SUMMONS |
| KIEWIT BUILDING GROUP, INC.; KIEWIT INFRASTRUCTURE WEST CO.; AND DOE DEFENDANTS 1-100, | |
| Defendants. | |

## COMPLAINT

COMES NOW, Plaintiff THOMAS I. HO (hereinafter "Plaintiff HO"), by and through

his attorneys, Michael Jay Green and Glenn H. Uesugi, and for Complaint against Defendants

KIEWIT BUILDING GROUP, INC. (hereinafter "Defendant KIEWIT BUILDING"), KIEWIT

INFRASTRUCTURE WEST CO. (hereinafter "Defendant KIEWIT INFRASTRUCTURE") and

DOE DEFENDANTS 1-100 alleges and avers as follows:

1.    At all time relevant herein, Plaintiff HO was a resident of the County of

I do hereby certify that this is a full, true, and correct copy of the original on file in this office.

Clerk, Circuit Court, First Circuit

EXHIBIT A

Honolulu, State of Hawaii.

2.      Defendant KIEWIT BUILDING is and was at all times relevant herein a domestic profit corporation doing business in the County of Honolulu, State of Hawaii.

3.      The employees, agents, associates, and/or representatives of Defendant KIEWIT BUILDING and others who held themselves out as being employees, agents, associates, and/or representatives of Defendant KIEWIT BUILDING were acting within the scope of such relationship. Defendant KIEWIT BUILDING is therefore liable for all of the acts and/or omissions of its employees, agents and/or putative employees under the doctrine of respondeat superior, or are otherwise vicariously liable for their acts and omissions under principal/agent or master/servant principles.

4.      The employees, agents, associates, and/or representatives of Defendant KIEWIT BUILDING were acting under the actual and/or apparent authority and/or agency of Defendant KIEWIT BUILDING. Therefore, Defendant KIEWIT BUILDING is liable for all acts and/or omissions of the employees, agents, associates, and/or representatives of Defendant KIEWIT BUILDING under the theory of apparent authority/agency, or is otherwise vicariously liable for its acts and omissions under the theory of apparent authority/agency, or is otherwise vicariously liable for its acts and omissions under the theory of apparent authority/agency.

5.      Defendant KIEWIT INFRASTRUCTURE is a domestic limited partnership doing business in the County of Honolulu, State of Hawaii.

6.      The employees, agents, associates, and/or representatives of Defendant KIEWIT INFRASTRUCTURE and others who held themselves out as being employees, agents, associates, and/or representatives of Defendant KIEWIT INFRASTRUCTURE were acting

within the scope of such relationship. Defendant KIEWIT INFRASTRUCTURE is therefore liable for all of the acts and/or omissions of its employees, agents and/or putative employees under the doctrine of respondeat superior, or are otherwise vicariously liable for their acts and omissions under principal/agent or master/servant principles.

7. The employees, agents, associates, and/or representatives of Defendant KIEWIT INFRASTRUCTURE were acting under the actual and/or apparent authority and/or agency of Defendant KIEWIT INFRASTRUCTURE. Therefore, Defendant KIEWIT INFRASTRUCTURE is liable for all acts and/or omissions of the employees, agents, associates, and/or representatives of Defendant KIEWIT INFRASTRUCTURE under the theory of apparent authority/agency, or is otherwise vicariously liable for its acts and omissions under the theory of apparent authority/agency, or is otherwise vicariously liable for its acts and omissions under the theory of apparent authority/agency.

8. Plaintiff is ignorant of the true names and capacities of Defendants sued herein as DOE DEFENDANTS 1-100 and therefore sue said Defendants by such fictitious names. Plaintiffs will amend their Complaint to allege their true names and thereon allege that each of the fictitiously named Defendants are responsible in some manner for the occurrences herein alleged, and that Plaintiffs' damages, as herein alleged, were proximately caused by their conduct. Plaintiff has made good faith and diligent efforts to identify said Defendants, including interviewing individuals with knowledge of the claims herein. Plaintiff is informed and believe and therefore allege that at all times herein mentioned, Defendants, and each of them, were the agents, servants and employees of each of the other Defendants herein, and were acting with the permission and consent and within the course and scope of said agency and employment.

9.     At all times relevant herein, Plaintiff HO was an employee of Defendants.

10.     Plaintiff worked for Defendants for approximately ten years, starting as a Field Engineer and working his way up through Defendants' companies to progressively higher positions of responsibility.

11.     In late 2009, Plaintiff was asked to be the Environmental Compliance Manager for the biggest construction project in the state, The Honolulu Rail Transit Project.

12.     Being on the project, Plaintiff faced many obstacles including but limited to the fact that Defendants' Supervisors and Managers tend to look the other way when it came to Environmental Compliance.

13.     This made Plaintiff's job inherently difficult.

14.     On numerous occasions, Plaintiff would be undermined, overruled, threatened that Plaintiff did not belong in the field or that Plaintiff was not a good company stockholder because making our employees follow the rules would cost the company more money.

15.     Plaintiff's own supervisor, Tracy Martin, who was also the project Quality Manager, would not back Plaintiff.

16.     In fact, on numerous occasions Tracy Martin would instead pull Plaintiff aside and tell Plaintiff that "we need to get the work done so you are going to have to figure out a way to make it happen".

17.     Plaintiff constantly had to discuss with City and State Inspectors about how Defendants made a mistake and it would never happen again.

18.     The fact of the matter was that Plaintiff knew that following the rules just was not convenient for the Defendants' supervisors and managers, if it involved additional cost or

- 4 -

time.

19.    Craft Employees (operators, laborers etc..) would gladly place the right Erosion

Control Measures in place.

· 20.    However the majority of time, the Craft Employees told Plaintiff that their

Supervisor or Engineer did not allocate enough time to install Erosion Control Best Management

Practices (BMP's) or they did not have enough quantity to get the job done but decided that the

work could not wait and would proceed per their Supervisor's direction.

21.    Plaintiff's initial role as the Environmental Compliance Manager was to ensure

environmental compliance on the Farrington Guideway for the rail project,

22.    The Farrington Guideway is the first 6 miles of the rail project.

23.    This job involved ensuring that all City, State and Federal Permits and or rules

and regulations were followed at all times.

24.    Plaintiff was responsible for overseeing the following areas for the Farrington

Guideway:

        a.    NPDES Permits(Form B, Form C, Form F, & Form G)

        b.    Section 10/Section 401/Section 404 Permits

        c.    Stream Channel Alteration permits (SCAP)

        d.    Hawaii Coastal Zone Management (CZM)

        e.    Special Management Area Permits (SMA)

        f.    Flood Zone Variances/No Rise Certifications

        g.    MS4 Permits

        h.    Community Noise Permits/Variances

i.     Land Use & Special Use Permitting

j.     Ecologically sensitive area management

k.     Invasive species management

l.     Endangered and threatened species management per Section 7

Endangered Species Act

m.    Archaeological and Historically Sensitive Area Management

n.     Clear and Grub/Grading/Stockpiling/Trenching/Building Permits

o.     Street Use Permitting

p.     HDOT Permitting

q.     Industrial Wastewater Permitting

r.     Air Permitting

s.     Solid Waste Permitting and

t.     Landfill Profiles/Clearances   .

25.    Given that the Final Environmental Impact Statement was still not approved,

Honolulu Authority for Rapid Transportation (HART) and Kiewit Environmental Compliance

Teams had their hands full trying to jump through hoops to find exceptions to the rules to allow

what went from being called the "Pre-construction" to "Exploratory" as they were not allowed to

use the words construction as Defendants were going to be operating under what is called a

Chapter 343 exemption.

26.    Once those issues were resolved, Defendants were awarded the second and third

contracts which included the next 3.9 miles as well as the Maintenance and Storage Facility

(MSF).

27.    Defendants were obligated by contract to provide a minimum of (2) Environmental Compliance Managers (1) for Farrington Guideway and (1) for Kamehameha Guideway.

28.    Each manager was to have 1-3 staff.

29.    Plaintiff was the only Environmental Compliance Manager that was covering both jobs and at some points assisting with the MSF as well as even other jobs (Ilima at Leihano, Valley of the Temples etc..) all while on Farrington Guideway time and money.

30.    Plaintiff had become the so called Area Expert both within the Defendants' companies as well as outside agencies.

31.    From the start of the job in 2009 , Plaintiff had been severely overworked.

32.    Plaintiff was continuously brought up this issue with his supervisor Tracy Martin.

33.    Plaintiff continuously stated to Tracy Martin that he needed help and that Plaintiff was tired as Plaintiff had to work late every day/night just to keep Defendants' head above water.

34.    Tracy Martin continuously ignored Plaintiff's pleas for help and instead told Plaintiff that the work had to get done and that help was on the way.

35.    On January 12, 2011, the district level quality manager (Jim Stenger) e-mailed Plaintiff and asked Plaintiff to send him a breakdown of the hours that Plaintiff was putting in and what was needed per the job requirements.

36.    Plaintiff sent the breakdown in email which showed Plaintiff putting in 70-80 hours a week.

- 7 -

37.     Plaintiff's breakdown also clearly showed that the job really needed to cover at least 89 hours per week.

38.     Shortly after Plaintiff sent the e-mail, Plaintiff was called into Tracy Martin's office.

39.     Tracy Martin immediately threw down a print out of Plaintiff's hourly breakdown onto the table and started telling Plaintiff "What the Hell is this? Are you trying to make us all look bad? "

40.     Tracy Martin then proceeded to humiliate Plaintiff by ripping apart the breakdown of the hours that had been sent in the e-mail.

41.     Mr. Martin took out his pen and crossed out over half of the items on the breakdown and told Plaintiff "This is more like the hours that you are putting in".

42.     Plaintiff responded by telling Mr. Martin hours shown are accurate.

43.     Plaintiff would receive notices like the e-mai Plaintiff received from Jason Bright on 10-8-13 in regards to Defendants using an area by Fort Weaver and Farrington Highway illegally.

44.     However Plaintiff and others in Defendants' employ would have to jump through hoops to make it all go away.

45.     Plaintiff was forced to draft environmental documentation that would say that Defendants looked at all impacts before utilizing the property, even if not true as many times Defendants were already somewhat occupying the area in question.

46.     In and about December 5, 2013, weekly inspections were  required of any RCRA Hazardous Waste Accumulation Areas as well as any chemical or fuel storage areas.

47.   Any deficiencies found during an inspection shall be fixed immediately as there are steep fines associated with failure to abide by the rules and regulations.

48.   Several major deficiencies were listed upon inspection and although Plaintiff discussed the need for immediate action to several of the supervisors, Plaintiff got zero action. ..

49.   This was brought up to Plaintiff's supervisor Tracy Martin several times as well verbally in his office and with still no action or response from Mr. Martin or Defendants.

50..   Plaintiff stressed that Defendants could face civil and criminal penalties

51..   Mr. Martin and others in Defendants' employ would just joke that it would be on Plaintiff's name since he was in charge of environmental issues.

52.   This went on for about six months before anybody took Plaintiff.

53.   At that point, Tracy Martin tried to quickly clean up the mess by calling Phillips Services out to remove everything, without thinking about how it would affect Defendants' waste generator status.

54.   Plaintiff knew from the beginning of his work on the rail project that the key to success in the Environmental Program was going to be education.

55..   Plaintiff had a substantial training program that many agencies reference to others as a model program.

56.   As production ramped up, slowly training was no longer allowed in the form it once was given.

57.   Defendants and its employees barely touched the tip of the iceberg when it came to rules and regulations under the initial three hour training.

58.   However, on February 13, 2014, Plaintiff was instructed by Tracy Martin to

change the training to a single page, three minute indoctrination.

59.    The lack of training became apparent when nobody seemed to know permit requirements.

60.    In an email dated March 3, 2014 between Plaintiff and Kevin Young (Project Manager of the Kamehameha Guideway Segment), Plaintiff noted that Defendants' action were not allowed pursuant to the noise permit or variance.

61.    Mr. Young acknowledged Plaintiff is correct but proceeded anyway.

62.    Plaintiff's discussion between he and Mr. Young was passed on to Mr. Young's supervisor, Brent Scheele, who asked Plaintiff: "How much money do we have to lose to make it acceptable to you to be out of compliance just for a little while?"

63.    On April 10, 2014, HDOT Inspector Tin Lung Chao emailed a report with several violations on the Kamehameha Highway Guideway (KHG).

64.    The violations have to do with illegal concrete washout, improper storage of asphalt cold patch material, oil leaking from machinery onto ground and into trench as well as failure to abide by the project noise permit and variance.  Plaintiff has several follow up discussions with Project Manager Kevin Young, Tracy Martin as well as Edwina Campbell (who is responsible for KHG Permits and part environmental), who inform Plaintiff to keep his comments regarding illegalities to himself.

65.    On or about May 2, 2014, Plaintiff received a phone call from Corporate HR manager Jane Sewell.

66.    Ms. Sewell had left Plaintiff a message in regards to a recent meeting that Plaintiff had with both Plaintiff's Area Manager Sharon Thom as well as Project Sponsor Tim

- 10 -

Mackin as well as Plaintiff's immediate supervisor Tracy Martin.

67.     Plaintiff sent Ms. Sewell the notes from the meeting that Plaintiff had sent to his

Area Manager Sharon Thom on April 11, 2014.

68.     Plaintiff specifically said that he had not sent to all parties at the meeting as

Plaintiff was worried that if the notes got into the wrong hands that they could make several

people very upset and take it out on Plaintiff.

69.     The notes Plaintiff had presented covered everything from haz mat issues,

falsification of documents, lack of properly trained staff, etc.

70.     A conference call listed as privledged and confidential was held with Corporate

Environmental Manager Connie Determan, Corporate lawyers Jeremy Stewart and John

Carpenter.

71.     This lead to all of the above flying out to Hawaii from Nebraska to investigate

all of Plaintiff's claims.

72.     One by one, Ms. Determan, Mr. Stewart and Mr. Carpenter interviewed all of

the people that Plaintiff had mentioned in his memo.

73.     Ms. Determan, Mr. Stewart and Mr. Carpenter also grilled Plaintiff for

information for days on end until basically they told Plaintiff: "Thomas, the problem is that you

are right…you are right about all of the issues". T

74.     Ms. Determan, Mr. Stewart and Mr. Carpenter proceeded to have a close out

meeting in which there was documentation from all of their investigation.

75.     However Plaintiff was never able to obtain a copy for his own records even

though Plaintiff requested so.

76.     Between June 4, 2014 and August 27, 2014, the State of Hawaii Department of Health issued noise violations for back up alarms which they were constantly warned about.

77.     On June 9, 2014, after Plaintiff had met with District Environmental Manager Robert Brenner, Plaintiff sent an e-mail explaining that the project was at risk due to lack of supervision and lack of Environmental Personnel.

78.     Plaintiff stated clearly in his email that there were big problems with the management of both the West Oahu Farrington Guideway as well as the Kamehameha Highway Guideway.

79.     Robert Brenner was initially very supportive and had written a letter/e-mail in support of Plaintiff and the program.

80.     However after he read it to Plaintiff to ensure that he had captured everything, he was told to delete it from and sent Plaintiff the e-mail sent on June 10, 2014 at 6:39am stating that neither he nor the Corporate Environmental Manager would ignore such an issue.

81.     On June 13, 2014, Plaintiff received an e-mail from his Area Manager Sharon Thom stating what she thought were Plaintiff's thoughts for going forward.

82.     However, Ms. Thom's email summarizing Plaintiff's thoughts was not accurate.

83.     The e-mail led people to believe that Plaintiff just wanted to make more money and that the circumstances that Plaintiff was having to endure while being the Environmental Manager had nothing to do with wanting to get off of the job.

84.     Plaintiff clearly had told Defendants that Plaintiff enjoyed performing his job and was highly respected by all agencies as well as other companies.

85.     Plaintiff wanted to move off of job as Plaintiff was concerned about his personal

livelihood and Plaintiff just wanted to ensure that Plaintiff would still have a job when all was said and done.

86.     Plaintiff was told that Plaintiff would no longer answer to Tracy Martin up until Plaintiff left the project.

87.     Plaintiff would report solely to Tim Mackin (Project Manager/Sponsor)and Greg Uyematsu (Deputy Project Manager).

88.     Plaintiff was also pulled aside by Greg Uyematsu to discuss moving forward.

89.     Mr. Uyematsu was insinuated that the problem was more having to do with Plaintiff's inability to work with "Haole" people.

90.     Mr. Uyematsu further stated that he thought that Plaintiff would respond better to him because he was a "Local" boy from Kauai.

91.     Mr. Uyematsu's accusations regarding Plaintiff's alleged inability to work with caucasian people was false.

92.     The rail project was plagued by dust issues for failure to follow proper required stockpile protection procedures.

93.     This was a violation of the Clean Air Act and Clean Water Act.

94.     There was and still are so many stockpiles that are not properly protected on the job from erosion due to Wind or Rain.

95.     An email was sent on or about July 22, 2014 regarding residents complaining about dust blowing into their homes.

96.     This had been an ongoing issue and continues to be an issue to date.

97.     Dan Grabauskas stated that he wanted the issue dealt with immediately.

- 13 -

98.   The Hawaii Department of Health Clean Air Branch sent an inspector on multiple occasions.

99.   Defendants were given warnings and/or citations.

100.   On or about August 19, 2014, Plaintiff received a telephone call from Pineridge Trucking that there were loads of soil that came in overnight off of the Rail project that smelled heavily of petroleum.

101.   Plaintiff took Alika Okamitsu (newly hired environmental engineer) to the Pineridge stockpile.

102.   Both Plaintiff and Mr. Okamitsu smelled the petroleum.

103.   Plaintiff and Mr. Okamitsu then notified managers to ensure that Defendants stop hauling the petroleum soaked soil.

104.   Plaintiff also questioned how the workers did not smell it to start off with before loading it offsite as they should have shut down the job and investigated.

105.   Kevin Young's response was that he spoke to crews and nobody smelled anything or knew where it came from.

106.   Plaintiff tested the soil and segregating it within Pineridge's stockpile area. Defendants' personnel did or should have been able to identify this and should have stopped work immediately.

107.   The procedures and protocols for identifying Petroleum Contaminated Soil (PCS) were not followed until they absolutely had to be because Pineridge spoke up.

9-4-14/9-9-14

108.   On September 4, 2014, Plaintiff was visited by Sharon Thom to discuss the

- 14 -

future of Plaintiff's career with Defendants going forward.

109.   Ms. Thom had told Plaintiff that she wanted to discuss things.

110.   The first thing Ms. Thom brought up was that according to Greg Uyematsu and Tracy Martin, there was question in regards to Plaintiff's attendance at work as Plaintiff's truck GPS records showed Plaintiff's truck being home during work hours.

111.   Plaintiff explained to Ms. Thom that that was a false accusation because if she checked the records Plaintiff's truck would be shown to be at home currently as well.

112 .   Plaintiff explained that he had things to do after work and for that reason Plaintiff did not bring the company truck to work because Plaintiff did not want to get in trouble for utilizing it for personal gain.

113.   Ms. Thom then went on to state that she felt that the Rail management were gunning for Plaintiff and that she just needed to get Plaintiff off the job and to just bear with it.

114.   Defendants were retaliating against Plaintiffs because of Plaintiff's constant raising of violations of both federal and state laws.

115.   Ms. Thom stated to Plaintiff that when they brought the issue up to her, she quickly pointed out all the other times in which Plaintiff's truck was at work after hours as she knew Plaintiff worked round the clock.

116.   Ms. Thom told Plaintiff that Plaintiff would be relocated down the road to Kapolei II Elementary School which was a job that was currently ongoing with Defendant KIEWIT BUILDING.

117.   Plaintiff told Ms. Thom about his desire to remain employed with Defendants on Oahu and that he wanted to get away from the rail project due to the continuous state and

federal law violations that Defendants were guilty of.

118.    Plaintiff was then informed about a "better opportunity" that came up.

119.    This "better opportunity" came after Plaintiff's discussions about staying on Oahu and just getting away from the legal issues surrounding rail with regard to Defendants.

120.    Plaintiff was told that Defendants wanted Plaintiff to relocate to Denver, Colorado.

121.    Plaintiff was offered an engineering position.

122.    However, Plaintiff would no longer have a company vehicle, would not receive any housing or subsistence allowance.

123.    Plaintiff was also told that he would be given a pay cut due to the COLA and that if Plaintiff could not make ends meet in Colorado, Plaintiff could live with a co-worker.

124.    Plaintiff told Ms. Thom that he would consider it.

125.    The next day, Plaintiff e-mailed Ms. Thom and told her that there was no way that Plaintiff could make it financially unless Plaintiff received similar benefits to others whom had relocated.

126.    Ms. Thom responded that relocation packages are done on a case by case basis and that because Plaintiff did not own a house Plaintiff did not qualify for certain benefits.

127.    However, Plaintiff knew that Defendants made exceptions for others.

128.    Ms. Thom sent Plaintiff an e-mail on September 11, 2014 telling Plaintiff that Plaintiff could sell his company stock back to pay for his move to Colorado as this would be a permanent relocation.

129.    Plaintiff told Ms. Thom that he could not do that as Plaintiff could barely get by

living at home with his parents.

130.    Plaintiff stated to Ms. Thom that none of this seemed fair.

131.    In response, Ms. Thom told Plaintiff that she would see if Plaintiff could just go to Kapolei II Elementary as per the original plan.

132.    On September 17, 2014, Plaintiff e-mailed the Kapolei II Elementary Project Manager and asked him about a company Truck to utilize while on the project.

133.    Plaintiff had already had a company vehicle for 5-6 years as is standard for company stockholders.

134.    Plaintiff was inquiring as Plaintiff was informed by Ms. Thom that he would begin work on the new project in the following week.

135.    Even though Plaintiff was THE ONLY STOCKHOLDER and the most SENIOR Kiewit Employee on the new job,  Plaintiff was told that Plaintiff would start as a project engineer over there and work his way up to a supervisor role.

136.    Plaintiff went from being a field engineer, to project engineer to superintendent to manager to back to being an engineer all due to speaking up regarding the illegalities committed by Defendants on the Rail project.

137.    On or about September 19, 2014, Plaintiff was told that he needed to return his company truck upon leaving the rail project.

138.    Plaintiff was also told to relocate all of his office belongings to the new job location.

139.    In the process of loading his boxes and furniture into his truck at Plaintiff's rail office, Plaintiff suffered a work injury to his back.

- 17 -

140.   When Plaintiff realized he had a work injury, he reported it to Defendants.

141.   Upon learning of Plaintiff's work injury, Plaintiff was asked by Defendant's area manager Mary Browne if Plaintiff really wanted to file the Worker's Compensation claim as it would create huge problems for Plaintiff.

142.   Plaintiff told Ms. Browne that he did wish to report the worker's compensation claim.

143.   Plaintiff was later told his worker's compensation claim was denied by Defendants.

144.   Because of the claim denial, Plaintiff could not get any treatment as nothing was approved.

145.   Plaintiff had to utilize his own insurance to get pain killers; however that was the only treatment that Plaintiff was allowed to receive.

146.   After four months, Plaintiff was told that Defendants' workers' compensation insurance carrier was Sedwick.

147.   Plaintiff requested a hearing to determine coverage and compensibility of the worker's compensation claim.

148.   Plaintiff was constantly in communication with Defendants trying to get treatment so that Plaintiff could return to work.

149.   Plaintiff's physician released Plaintiff to light duty to return to work and given a list of restrictions.

150.   Defendants never responded.

151.   Plaintiff received an injury during physical therapy which aggravated Plaintiff's

worker's compensation injury and was taken off work,

152.    Soon thereafter, Defendants' Human Resources person, Jane Sewell, state that Defendants had a position for Plaintiff.

153.    However, no one from Defendants ever communicated that position to Plaintiff.

154.    At the workers' compensation hearing, Plaintiff's injury was found compensible.

155.    Representing Defendants was Gallagher Bassett, not Sedgwick as Plaintiff was originally told.

156.    In or about May 2015, Defendants terminated Plaintiff's employment.

157.    In committing the above acts and omissions, Defendants acted wantonly and/or oppressively and/or with such malice as implies a spirit of mischief or criminal indifference to civil obligations and/or there has been some wilful misconduct that demonstrates that entire want of care which would raise the presumption of a conscious indifference to consequences, justifying an award of punitive damages in an amount to be proven at trial.

### COUNT I: VIOLATION OF HAWAII WHISTLEBLOWER'S PROTECTION ACT

158.    Plaintiff realleges and incorporates by reference paragraphs 1 through 157 as if said paragraphs were fully set forth herein.

159.    The above acts by Defendant KIEWIT BUILDING with respect to Plaintiff constitute a violation of the Hawaii Whistleblower's Protection Act, Hawaii Revised Statutes Section 378-62.

160.    As a result of the aforementioned wrongful, unlawful, and illegal acts and/or omissions of Defendant KIEWIT BUILDING as alleged herein, Plaintiff suffered special and

general damages in an amount to be proven at trial.

WHEREFORE, Plaintiff respectfully prays for judgment in his favor and against

Defendants jointly and severally, as follows:

A.    For general damages in amount to be shown at trial;

B.    For special damages in an amount to be shown at trial;

C.    For punitive and/or exemplary damages in an amount to be shown at trial; and

D.    For attorneys' fees, costs, prejudgment and post-judgment interest and such

other and further relief both legal and equitable as the Court deems just and necessary under the

circumstances.

DATED: Honolulu, Hawaii, _____ JUN 3 0 2016 _____

_____
MICHAEL JAY GREEN
GLENN H. UESUGI
Attorneys for Plaintiff
THOMAS I. HO

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAII

16-1-1266-07   ECN.

| | |
|---|---|
| THOMAS I. HO, | CIVIL NO. _____ |
| | [Non-Motor Vehicle Tort] |
| Plaintiff, | |
| | DEMAND FOR JURY TRIAL |
| vs. | |
| | |
| KIEWIT BUILDING GROUP, INC.; KIEWIT INFRASTRUCTURE WEST CO.; AND DOE DEFENDANTS 1-100, | |
| | |
| Defendants. | |

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury on all issues so triable.

DATED: Honolulu, Hawaii, _____ JUN 3 0 2016

_____

MICHAEL JAY GREEN
GLENN H. UESUGI
Attorneys for Plaintiff
THOMAS I. HO

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAII

ECN.

| | | |
|---|---|---|
| THOMAS I. HO, | ) | CIVIL NO. ___16-1-1266-07___ |
| | ) | [Non-Motor Vehicle Tort] |
| Plaintiff, | ) | |
| | ) | SUMMONS |
| vs. | ) | |
| | ) | |
| KIEWIT BUILDING GROUP, INC.; KIEWIT | ) | |
| INFRASTRUCTURE WEST CO.; AND DOE | ) | |
| DEFENDANTS 1-100, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## SUMMONS

STATE OF HAWAII

TO:     THE DEFENDANTS

YOU ARE HEREBY SUMMONED and required to file with the court and serve upon Plaintiff's attorneys, whose address is stated above, an answer to the Complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the day of service.

If you fail to make your answer within the twenty day time limit, judgment by default will be taken against you for the relief demanded in the Complaint.

This Summons shall not be personally delivered between 10:00 p.m. and 6:00 a.m. on premises not open to the general public, unless a judge of the above-entitled Court permits, in writing on this Summons, personal delivery during those hours.

A failure to obey this Summons may result in an entry of default and default judgment

against the disobeying person or party.

DATED: Honolulu, Hawaii, _____

JUL. − 1 2016

_____
J. KUBO

CLERK OF THE ABOVE-ENTITLED COURT

SEAL

− 2 −