IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| THOMAS I. HO,<br><br>           Plaintiff,<br><br>    v.<br><br>KIEWIT BUILDING GROUP, INC.;<br>KIEWIT INFRASTRUCTURE WEST<br>CO.,<br><br>          Defendants. | CIV. NO. 17-00024 JMS-RT<br><br>ORDER DENYING DEFENDANTS'<br>MOTION FOR SUMMARY<br>JUDGMENT, ECF NO. 97 |

## ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, ECF NO. 97

## I. INTRODUCTION

Defendants Kiewit Building Group, Inc., and Kiewit Infrastructure West Co. (collectively, "Defendants" or "Kiewit"), move for summary judgment in this diversity case brought by Plaintiff Thomas Ho ("Plaintiff" or "Ho") alleging unlawful retaliation under the Hawaii Whistleblower Protection Act ("HWPA"). As explained to follow, the Motion is DENIED. Plaintiff is eligible to seek relief under the HWPA, and genuine issues of material fact remain as to whether Plaintiff's termination was done in retaliation for protected conduct.

## II. <u>BACKGROUND</u>

**A.    Procedural Background**

Plaintiff was terminated from his employment with Kiewit nearly ten years ago, on April 30, 2015 (effective May 1, 2015).[1]  The court thus begins with some background explaining the age of this litigation.  Plaintiff filed this suit in the Circuit Court of the First Circuit, State of Hawaii, on July 1, 2016.  *See* ECF No. 1-1.  After it was served on December 20, 2016, Defendants removed the suit to federal court based on diversity of citizenship on January 19, 2017.  *See* ECF No. 1 at PageID.3.

On March 9, 2018, the parties stipulated to stay all proceedings to allow them to explore settlement through mediation.  *See* ECF No. 33.  Subsequently, on February 7, 2019, the court administratively closed the case after such a stipulation by the parties.  *See* ECF No. 38.  After a discussion with a Magistrate Judge, the case was reopened in November 2019, ECF No. 41, and a series of settlement conferences were held in 2020.  *See* ECF Nos. 44, 50–55.

---

[1]  For purposes of this Order, the court draws no distinction between Kiewit Building Group, Inc., and Kiewit Infrastructure West Co.  Although Plaintiff may have initially worked for Kiewit Infrastructure West before his later transfer to Kiewit Building Group when he was fired, much of the record does not distinguish between the two corporate entities for purposes of his employment.  For example, some key employees for Kiewit (e.g., Vice President Sharon Thom and manager Jane Sewell) were involved with Plaintiff's employment and termination both before and after the transfer.

Defendants then filed a Motion for Summary Judgment on November 16, 2020, which was set for hearing on January 7, 2021.  ECF No. 57, 59.  On December 28, 2020, the case was re-assigned to this court after the then-assigned Judge recused himself, ECF No. 64, and the Motion was rescheduled for March 2021.  After a further settlement conference, the parties again agreed to administratively close the case on February 3, 2021, ECF No. 68, and the pending Motion was taken off calendar.

From July 7, 2021, through February 23, 2024, the parties filed nine joint status reports requesting that the case remain closed and that the administrative stay remain in place.  *See* ECF Nos. 71, 72, 74, 75, 78–82.  The parties were apparently awaiting resolution of a related workers' compensation matter, with an intent to pursue a global settlement.  *See* ECF No. 82 at PageID.678.  Meanwhile, counsel for Defendants retired, and new counsel entered their appearances.  ECF No. 77.

On March 14, 2024, a Magistrate Judge told the parties at a status conference that "the Court is not inclined to permit this matter to remain administratively closed without any clear indication as to when a resolution is anticipated."  ECF No. 85.  The parties were then ordered to enter private mediation.  *Id.*  After that mediation apparently failed, the case was re-opened on September 3, 2024.  ECF No. 93.

Defendants re-filed a Motion for Summary Judgment on September 25, 2024.  ECF No. 97.  Plaintiff filed his Opposition on October 9, 2024, ECF No. 99, and Defendants filed their Reply on October 25, 2024, ECF No. 104.  The court held a hearing on the Motion on November 26, 2024.  During the hearing, the court requested supplemental briefing, and additional briefing was filed on December 6, 2024, and on December 13, 2024.  *See* ECF Nos. 109, 111.

## B.    Factual Background

Plaintiff was an engineer at Kiewit, with most of the events at issue in this litigation occurring in 2014, when he was an environment compliance manager for Kiewit's work on the Honolulu rail project in West Oahu.  The suit alleges that, during his recent tenure, he reported several violations of federal, state, or local environmental laws or regulations.  He was met with resistance from Kiewit internally, and he claims several incidents of adverse actions as a result of his reporting.[2]  Plaintiff then suffered a work-related injury in September of 2014, in conjunction with a re-assignment from the rail project to a project at a school in Kapolei.  After experiencing difficulty with workers' compensation matters and

---

[2]  This factual background section is primarily based on written testimony in the form of Plaintiff's declaration, as supported by numerous documents and emails.  *See* ECF Nos. 100 through 100-46.  Defendants offer substantial evidence as to the context of Plaintiff's testimony, and the reasons for his termination from their point of view.  Although Defendants' evidence sheds light on the context of Plaintiff's testimony, and could indicate no retaliatory motive, the court is obligated at this summary judgment stage to construe evidence in the light most favorable to Plaintiff.  *See, e.g.*, *Scott v. Harris*, 550 U.S. 372, 378 (2007).

with his medical condition, Plaintiff was terminated from Kiewit after refusing a

severance offer.  The suit claims retaliation for engaging in protected activity under

the HWPA.  Some of the key details are set forth in a timeline fashion as follows

(with some evidence that is particularly relevant to causation detailed later in the

appropriate discussion sections of the Order):

| | |
|---|---|
| Late 2009 | Plaintiff begins his job as an Environmental Compliance Manager for Kiewit Infrastructure West, working on Honolulu's Rail Transit Project.  Prior to that he worked for Kiewit for about 10 years, starting as a field engineer.  ECF No. 100-1 at PageID.882. |
| March 3, 2014 | Plaintiff writes emails to Kevin Young, Project Manager of the Kamehameha Guideway Segment of the rail project, noting that Kiewit's actions were not allowed "pursuant to the noise permit or variance."  *Id*. at PageID.886.  "Mr. Young acknowledged [Plaintiff] was correct but proceeded anyway without the required written authorization . . . ."  *Id.* |
| March 2024 | Plaintiff's discussion with Mr. Young is passed to his supervisor, Brent Scheele, who asks Ho, "How much money do we have to lose to make it acceptable to you to be out of compliance just for a little while?"  *Id*. at PageID.886–887. |
| March 5, 2014 | Plaintiff sends another violation-related email.  ECF No. 100-4 at PageID.932–936.  Plaintiff claims he was "made out to be 'The problem' and managers would compare [him] to being a 'Cop' or police officer for strictly enforcing the law."  ECF No. 100-1 at PageID.888. |
| March 11, 2014 | Plaintiff meets with manager Tracy Martin regarding previous reports and the "authenticity of [Ho's] signature on a HDOT permit," which appeared to be fraudulent.  *Id*.  Martin tells him "Right now, we're not on the same |

|  | team.  And [long term if] we can't be on the same team, then one of us has to go to a different team, [Okay?]." *Id.* |
|---|---|
| April 10, 2014 | An inspector from the Honolulu Department of Transportation emails a report about "several violations on the Kamehameha Highway Guideway."  *Id.* at PageID.894.  The violations "have to do with illegal concrete washout, improper shortage of asphalt cold patch material, oil leaking from machinery onto ground and into trench[,] as well as failure to abide by the project noise permit and variance."  Ho is informed by Kiewit managers "to keep my comments regarding illegalities to myself."  *Id.* |
| April 11, 2014 | Plaintiff sends an email with notes regarding violations to Area Manager Sharon Thom.  ECF No. 100-8 at PageID.972.  The notes "covered falsification of documents, lack of properly trained staff, violations in regards to [several federal environmental laws] and other issues."  ECF No. 100-1 at PageID.895. |
| April 22, 2014 | Plaintiff sends an email to HART informing it that he would be leaving the rail project "for reasons he could not discuss," apparently for an environmental position on the Big Island.  *Id.* at PageID.893, 895.  Plaintiff claims he was denied this lateral position.  *Id.* at PageID.893.<br><br>Ho claims that "[t]his was the beginning of numerous, consistent adverse employment actions taken against me for reporting illegalities with respect to Environmental issues connected to the rail project."  *Id.* |
| June 2014 | Kiewit officials from Nebraska come to Hawaii to investigate Plaintiff's claims regarding noncompliance with city, state and federal environmental laws.  *Id.* at PageID.896.  Plaintiff attests that during the investigation, investigators "grilled me for information for days on end until basically they told me: 'Thomas, the |

problem is that you are right . . . you are right about all of
the issues.'" *Id.* at PageID.897.

June 9, 2014          After Kiewit conducts an internal investigation, a Kiewit
                      District Environmental Manager, Robert Brenner, writes
                      a letter or report (draft) agreeing with Plaintiff. *See* ECF
                      No. 100-13 at PageID.985. The lengthy letter/report
                      concludes among other things that

> "there are significant environmental issues that
> must be dealt with **immediately**." "[Plaintiff] very
> clearly knows the federal, state, and local laws, as
> well as the permit conditions under which the
> project operates . . . I believe that the problems
> Thomas point out are either ignored, along with
> [plaintiff's] direction, or the staff do not know that
> environmental issues are actually important . . . .
> The project is currently at grave risk of receiving
> notices of violation and fines if a regulatory
> inspector show up on the site . . . ."

ECF No. 100-1 at PageID.898; ECF No. 100-13 at
PageID.985. Plaintiff attests that Brenner was told by
Kiewit to delete the letter and send out a "significantly
redacted version." ECF No. 100-1 at PageID.898.

June 2014             Plaintiff has discussions with Sharon Thom about
                      Plaintiff's "thoughts for going forward." *Id.* at
                      PageID.899. Plaintiff claims that during this period "I
                      was told that there was no future for me in environmental
                      with [Kiewit]." *Id.* at PageID.900. "Because of that, at
                      Sharon Thom's urging, I did mention that I wished to
                      return to engineering, in the hopes that I could get the . . .
                      Maintenance and Storage Facility (MSF) Rail job that I
                      was being recruited for which entailed both
                      environmental and engineering skill sets and work." *Id*.
                      "Sharon Thom told me to say this in my email so that she
                      could get me off of the job I was currently at." *Id.*

| | |
|---|---|
| July 21, 2014 | Plaintiff reports and discusses complaints regarding violations of law regarding dirt and dust blowing from Kiewit construction sites near Aloha Stadium onto nearby homes.  *Id*. at PageID.903; ECF No. 100-18 at PageID.1007–1008. |
| August 19, 2014 | Plaintiff reports and discusses another violation regarding petroleum tainted soil.  ECF No. 100-1 at PageID.904; ECF No. 100-19 at PageID.1012. |
| August 2014 | Plaintiff attests that he was not allowed to take a lateral position at the Kiewit Maintenance and Storage Facility Rail Project.  ECF No. 100-1 at PageID.905. |
| Sept. 4, 2014 | Plaintiff is "visited by Sharon Thom to discuss the future of my career with Defendants going forward."  *Id*.  Thom begins by questioning Plaintiff's work attendance based on GPS records of the company truck.  *Id.*  Thom says to him "that she felt that the Rail management were gunning for me and that she just needed to get me off the job and to just bear with it."  *Id.* at PageID.906. |
| Sept. 7, 2014 | Thom tells Plaintiff he would be relocated to a Kiewit project at Kapolei II Elementary School.  *Id*. at PageID.907.  Plaintiff is confused by this reassignment. *Id.* at PageID.907–908. |
| Sept. 9, 2014 | Thom informs Plaintiff that instead he is being offered a job in Denver, Colorado.  He "was told that Defendants and rail management wanted [him] to relocate to Denver, Colorado."  *Id*. at PageID.908.  The engineering position included a pay cut with lesser benefits.  *Id.*  Plaintiff considers the position but declines it.  *Id.* at PageID.909. |
| Sept. 17, 2014 | Plaintiff is relocated to the Kapolei project.  This is an entry level engineering position, with lesser benefits.  *Id.* at PageID.910.  Plaintiff attests that he "was not given a choice with respect to the Kapolei II [position]."  *Id.* |

8

| | |
|---|---|
| Sept. 2014 | Plaintiff injures his back while loading boxes and furniture relocating things to Kapolei. |
| Sept. 2014 to April 2015 | Plaintiff has multiple issues with a workers' compensation claim, his back injury, and multiple instances of work absences. These events are detailed in the discussion section to follow when analyzing whether Plaintiff has met a burden to demonstrate a causal connection between protected activity and adverse employment action. |
| April 30, 2015 | Plaintiff is terminated from employment as of May 1, 2015, with eligibility for being rehired, telling him "[a]t such time [] that you are able to return to work, please contact [Kiewit] and we will review open positions with you." ECF 98-29 at PageID.813. |

According to representations from Plaintiff's counsel at the hearing on the Motion, Plaintiff has remained on disability since his termination.

## III.  <u>STANDARD OF REVIEW</u>

Summary judgment is proper when there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "An issue is 'genuine' only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is 'material' only if it could affect the outcome of the suit under the governing law." *In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

"The moving party initially bears the burden of proving the absence of a genuine issue of material fact." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). "When the moving party has carried its burden . . . its opponent must do more than simply show that there is some metaphysical doubt as to the material facts"; instead, the opponent must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (citation and internal quotation marks omitted). "This burden is not a light one. The non-moving party must show more than the mere existence of a scintilla of evidence." *In re Oracle*, 627 F.3d at 387 (citation omitted); *see also Anderson*, 477 U.S. at 248 (stating that a party cannot "rest upon the mere allegations or denials of his pleading" in opposing summary judgment).

When considering a motion for summary judgment, the court views the facts and draws reasonable inferences in the light most favorable to the nonmovant. *See, e.g.*, *Scott*, 550 U.S. at 378. "[T]he court does not make credibility determinations or weigh conflicting evidence. Rather, it draws all inferences in the light most favorable to the nonmoving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).

## IV. **DISCUSSION**

### A.    **Hawaii Whistleblower Protection Act Claim**

The Complaint alleges a single claim for retaliation in violation of the

HWPA, which is set forth in HRS § 378-62.[3]

> An HWPA claim under § 378–62 has three requirements.
> First, an employee must have "engaged in protected
> conduct" as defined by HRS § 378-62(1).  Second, the
> employer must take some "adverse action" against the
> employee.  And third, there must be "a causal connection
> between the alleged retaliation and the
> 'whistleblowing.'"  To meet the causal connection
> requirement, an "employer's challenged action must have

---

[3] Section 378-62 provides:

> An employer shall not discharge, threaten, or otherwise
> discriminate against an employee regarding the employee's
> compensation, terms, conditions, location, or privileges of
> employment because:
>
> (1) The employee, or a person acting on behalf of the employee,
> reports or is about to report to the employer, or reports or is about
> to report to a public body, verbally or in writing, a violation or a
> suspected violation of:
>
> > (A) A law, rule, ordinance, or regulation, adopted pursuant
> > to law of this State, a political subdivision of this State, or
> > the United States; or
> >
> > (B) A contract executed by the State, a political subdivision
> > of the State, or the United States, unless the employee
> > knows that the report is false; or
>
> (2) An employee is requested by a public body to participate in an
> investigation, hearing, or inquiry held by that public body, or a
> court action.

been taken 'because' the employee engaged in protected
conduct."

*Tagupa v. VIPdesk, Inc.*, 125 F. Supp. 3d 1108, 1119 (D. Haw. 2015) (quoting

*Griffin v. JTSI, Inc.*, 654 F. Supp. 2d 1122, 1131 (D. Haw. 2008)); *see also Crosby*

*v. State Dept. of Budget & Fin.*, 76 Haw. 332, 342, 876 P.2d 1300, 1310 (1994).

The three elements of a prima facie case of retaliation are examined as

part of a framework adopted from *McDonnell Douglas Corp. v. Green*, 411 U.S.

792 (1973).  *See Chan v. Wells Fargo Advisors, LLC*, 124 F. Supp. 3d 1045, 1055

(D. Haw. 2015) ("In *Crosby* . . . the Hawaii Supreme Court essentially adopted the

familiar *McDonnell Douglas* burden-shifting framework for claims under [the

HWPA].")); *see also, e.g.*, *Bassett v. Haw. Disability Rts. Ctr.*, 2020 WL 7351113,

at *16 (D. Haw. Nov. 20, 2020) ("[C]ourts apply the *McDonnell Douglas*

framework to retaliation claims under the HWPA.") (citations omitted).  That is, in

lieu of direct evidence of retaliation,

> [u]nder the *McDonnell Douglas* framework, the plaintiff
> must first establish a prima facie case of retaliation by
> showing (1) involvement in a protected activity, (2) an
> adverse employment action, and (3) a causal link
> between the two.  Once a plaintiff has made a prima facie
> showing, the burden of production, but not persuasion,
> shifts to the defendant to articulate some legitimate,
> nondiscriminatory reason for the challenged action.
> Should the defendant carry its burden, the burden then
> shifts back to the plaintiff to raise a triable issue of fact

12

> that the defendant's proffered reason was a pretext for
> unlawful retaliation.

*Bassett*, 2020 WL 7351113, at *11 (internal citations, quotation marks, and

brackets omitted); *see also Chan*, 124 F. Supp. 3d at 1055–1057 (applying

*McDonnell Douglas* to HWPA claim).[4]  "The burden of proof, however, always

remains with the plaintiff."  *Chan*, 124 F. Supp. 3d at 1055.[5]  At this point, "the

*McDonnell Douglas* framework 'disappears,' and 'the sole remaining issue is

discrimination *vel non.*'"  *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1062

(9th Cir. 2002) (quoting *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 143

(2000) (some marks omitted)).

"Under the *McDonnell Douglas* framework, the requisite degree of

proof necessary to establish a prima facie case . . . on summary judgment is

minimal and does not even need to rise to the level of a preponderance of the

---

[4] "*The McDonnell Douglas* framework is 'a tool to assist plaintiffs at the summary judgment stage' in cases where there may be 'difficulties in proving intent to discriminate in a disparate treatment context.'"  *Bassett*, 2020 WL 7351113, at *11 n.13 (quoting *Costa v. Desert Palace, Inc.*, 299 F.3d 838, 854–55 (9th Cir. 2002)).  "Alternatively, a plaintiff may 'simply produce direct or circumstantial evidence demonstrating that a discriminatory or retaliatory reason more likely than not motivated the employer.'"  *Id.* (quoting *Surrell v. Cal. Water Serv. Co.*, 518 F.3d 1097, 1105 (9th Cir. 2008) (internal brackets omitted)).

[5] In *Tagupa*, the court analyzed an HWPA claim by applying *Crosby* and analyzing the causal connection element in conjunction with the affirmative defense and pretext prongs—essentially applying *McDonnell Douglas* without specifically citing to its standards.  *See* 125 F. Supp. 3d at 1120–24.

evidence." *Kama v. Mayorkas*, 107 F.4th 1054, 1059 (9th Cir. 2024) (quoting

*Opara v. Yellen*, 57 F.4th 709, 722 (9th Cir. 2023)).

> This minimal burden is doubtless justified by the fact that
> those discriminating against a person because of that
> person's protected activity may not, in their statements
> and documents, create direct evidence of discrimination,
> though the claim against them is equally justified as in a
> case where the discrimination has been admitted.

*Id.*

## B.    The Scope of the Motion

Defendants' Motion first argues that Plaintiff cannot prove the first

element ("protected conduct") of a prima facie case because he was an

environmental compliance manager.  They argue that because it was Plaintiff's job

to investigate and report violations or suspected violations of law to his employer,

such reporting cannot be "protected" under the HWPA.  If Defendants are correct

regarding a "compliance job" exception, then Plaintiff's entire HWPA claim fails

as a matter of law, regardless of whether the other elements could be met.

Second, Defendants argue that Plaintiff is unable to establish the third

element—a causal connection between his termination and any protected

conduct—of a prima facie case of retaliation.  And third, in arguing a lack of

causation, Defendants contend that Plaintiff's HWPA claim fails because they

terminated him for an inability to fulfill work functions and come to work—a

legitimate, nondiscriminatory reason for the adverse action.

14

As to the second and third arguments, the Motion is limited to the "adverse action" of Plaintiff's May 1, 2015 termination.  Plaintiff's Opposition, however, identifies other potential "adverse actions" besides the termination such as being reassigned or being denied lateral transfers after Plaintiff reported—albeit internally—potential legal violations.  *See Chan*, 124 F. Supp. 3d at 1056 (reiterating that "an [HWPA] action is cognizable as an adverse employment action if it is reasonably likely to deter employees from engaging in protected activity") (quoting *Black v. Correa*, 2008 WL 3845230, at *11 (D. Haw. Aug. 18, 2008)); *Crosby*, 76 Haw. at 341, 876 P.2d at 1309) ("[T]he HWPA provides protection to employees who report suspected violations of law from 'any form of retaliation by their employers.'") (quoting Sen. Stand. Comm. Rep. No. 1127, in 1987 Senate Journal, at 1392)).

But, as the court stated during the hearing on the Motion, the court does not consider this Motion as being directed to those other potential adverse actions—in this regard, the court views the Motion essentially as seeking *partial* summary judgment as to termination only.  As to other adverse actions, Defendants have not met their initial burden at summary judgment to demonstrate an absence of evidence to support Plaintiff's case.  *See, e.g.*, *In re Oracle*, 627 F.3d at 387 (reiterating the summary judgment standard, including that "[t]he moving party initially bears the burden of proving the absence of a genuine issue of material

15

fact") (citing *Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986)).  For this reason, the court does not analyze the evidence pertaining to whether Defendants unlawfully retaliated against Plaintiff other than his ultimate termination (nor does this Order recount all the details regarding other possible "adverse actions").

During the hearing, Defendants appeared to argue that the allegedly adverse actions (other than termination) raised in Plaintiff's Opposition are new, suggesting that the Complaint itself is limited to termination.  The court, however, reads the Complaint as indeed alleging—although in a jumbled fashion—several incidents that might constitute adverse actions *aside* from termination, that is, actions which could reasonably "deter employees from engaging in protected activity."  *Chan*, 124 F. Supp. 3d at 1056.[6]

The court first addresses a "compliance job" exception to an HWPA claim, and then addresses the causation element—whether the record supports a theory that Plaintiff's termination was in retaliation for protected activity.  Then,

---

[6] The Complaint was filed in state court before being removed to federal court, and therefore it did not need to meet the *Twombly/Iqbal* plausibility standard, at least when it was filed.  *See Bank of Am., N.A. v. Reyes-Toledo*, 143 Haw. 249, 252, 428 P.3d 761, 764 (2018) (expressly rejecting the plausibility standard and reaffirming that Hawaii state courts are governed by "notice" pleading standards), *overruled on other grounds by Wilmington Savings Fund Society, FSB v. Domingo*, 155 Haw. 1, 556 P.3d 347 (2024).  And under Hawaii's notice pleading standards, the Complaint alleges, after 18 pages of factual allegations, that "[t]he above acts . . . constitute a violation of the [HWPA]" and that "[a]s a result of the aforementioned wrongful, unlawful, and illegal acts and/or omissions . . . Plaintiff suffered [damages]."  ECF No. 1-1 at PageID.22–23.  That is, under either pleading standard, the Complaint read broadly is not limited to Plaintiff's termination as the basis for the HWPA claim.

the court address the other prongs of the *McDonnell Douglas* framework—whether

Defendants' defense of a non-discriminatory reason for termination is sufficient

and whether there is evidence of pretext.

## C.  Protected Activity:  Hawaii Courts Would Not Apply a "Compliance Job" Exception to the HWPA

It is undisputed that Plaintiff's job duties as the Environmental

Compliance Manager include reporting to Defendants of noncompliance or

suspected noncompliance with environmental laws or regulations.  *See* ECF No.

98-2 at PageID.744 (listing Plaintiff's responsibilities as including "Bi-Weekly

reporting of compliance [with all environmental regulations] to internal and

external partners" and "[t]imely reporting of incidents via the Kiewit tracking

system").  Defendants ask the court to adopt an exception to the HWPA that

precludes employees whose job duties require reporting noncompliance to the

employer from making HWPA claims, arguing that such internal reporting is not

"whistleblowing" because it is activity that such employees are expected to

perform.  Defendants argue that "[w]here an employee's job duties include

reporting to the employer non-compliance with laws or regulations, courts have

consistently held that the employee's reports of such non-compliance to the

employer do not constitute whistleblowing protected activity or protected activity

that can serve as a basis for a retaliatory discharge claim."  ECF No. 97-1 at

PageID.721–722.

Defendants' Motion cites three cases for the proposition that "courts have consistently held" that no protected activity occurs where an employee's job duties include reporting non-compliance. *See id.* at PageID.722 (citing *Klaus v. Vill. of Tijeras*, 2022 WL 4289952 (D.N.M. Sept. 16, 2022); *Cottrell v. Greenwell*, 2021 WL 741781 (W.D. Ky. Feb. 25, 2021); and *Wolf v. Pac. Nat'l Bank*, 2010 WL 5888778 (S.D. Fla. Dec. 28, 2010)).[7] *Klaus*, applying New Mexico law, granted summary judgment for an employer on a New Mexico Whistleblower Protection Act claim because plaintiff's alleged reporting activity was not "outside of her defined job duties." *Klaus*, 2022 WL 4289952, at *10. Similarly, *Cottrell*, although denying summary judgment to an employer because the plaintiff's job duties were disputed, indicated that under Kentucky law the plaintiff's job duties were relevant in determining whether he had engaged in whistleblowing. *See Cottrell*, 2021 WL 741781, at *5. And a magistrate judge in *Wolf* recommended dismissal of a bank president's federal whistleblower claim, reasoning that "[i]t is well established in federal whistleblower cases that a plaintiff does not engage in protected activity by disclosing violations of law as part of his job responsibilities." *Wolf*, 2010 WL 5888778, at *10 (citing *Sasse v. United States Dep't of Labor*, 409 F.3d 773, 779–80 (6th Cir. 2005)).

---

[7] Defendants' Reply also cites *Huffman v. Office of Personnel Management*, 263 F.3d 1341, 1351–53 (Fed. Cir. 2001), for the same proposition. *See* ECF No. 104 at PageID.1118 n.2.

Despite those cases, Defendants acknowledge that no published Hawaii case has addressed—one way or the other—whether Hawaii law follows such a "compliance job" exception for a retaliation claim of any sort (and the court has not found a published Hawaii case directly on point). *See Tongson v. County of Maui*, 621 F. Supp. 2d 1019, 1024 (D. Haw. 2008) (declining to exercise supplemental jurisdiction over HWPA claim, in part, because of this same open and novel issue of state law).[8] And the parties also acknowledge that a split of authority appears to exist in case law from other jurisdictions.[9]

"In the absence of controlling state law, a 'federal court sitting in diversity must use its own best judgment in predicting how the state's highest court would decide the case.'" *Tirona v. State Farm Mut. Auto. Ins. Co.*, 812 F. Supp. 1083, 1085 (D. Haw. 1993) (citations omitted). "Without certifying a question to the [State] Supreme Court, '[federal courts] are required to ascertain from all the available data what the state law is and apply it.'" *Soltani v. W. & S. Life Ins. Co.*,

---

[8] *Tongson* reasoned that "Defendants' motions for summary judgment raise novel issues of state law that would require this Court to construe certain portions of the HWPA that have not yet been addressed by Hawaii state courts." 621 F. Supp. 2d at 1024. A motion in *Tongson* "request[ed] summary judgment against [the plaintiff] on the ground that she cannot have a cause of action under the HWPA for reporting wrongdoing because [the plaintiff's] job itself 'placed her in a special position to identify the errors and bring them to the attention of her supervisors.'" *Id.* (quoting defendant's motion) (some brackets omitted). *Tongson* observed that "[w]hether this would constitute 'reporting' is an issue that has not yet been addressed by Hawaii courts." *Id.* *Tongson* also recognized that "Hawaii courts have not yet ruled on whether a 'report' under the HWPA must be made to a third party, or whether an employee can 'report' a wrongdoer's conduct to the wrongdoer himself." *Id.* at 1025.

[9] Defendants' position ultimately appears—at best—to be a minority view.

258 F.3d 1038, 1045 (9th Cir. 2001) (quoting *Ins. Co. of Penn. v. Associated Int'l*

*Ins. Co.*, 922 F.2d 516, 520 (9th Cir. 1990)).  "In so doing, a federal court may be

aided by looking to well-reasoned decisions from other jurisdictions."  *Takahashi*

*v. Loomis Armored Car Serv.*, 625 F.2d 314, 316 (9th Cir. 1980).  After analyzing

the cases cited by Defendants, examining "well-reasoned decisions from other

jurisdictions," *id.*, and considering the statutory language, the court predicts that

Hawaii would reject a "compliance job" exception to the HWPA.

    **1.**    ***Case Law from Other Jurisdictions Weighs Heavily Against***
                  ***Adopting an Exception***

          Although the court has not canvassed all other jurisdictions, many, if

not most, jurisdictions have rejected a job-based exemption from retaliation

claims—even under a limited situation where an employee's *entire* job is

compliance related (i.e., as distinguished from where an employee might have only

*some* job duties that entail compliance reporting).  *See, e.g.*, *Menard v. Targa*

*Resources, LLC*, 366 So. 3d 1238, 1244 (La. 2023) (rejecting a job duty exception,

reasoning in part that "judicially inserting a job duty exception into [the Louisiana

Environmental Whistleblower Statute] results in employees who likely have the

most knowledge of environmental violations not being protected from retaliation,"

and distinguishing prior federal law); *City of Fort Worth v. Pridgen*, 653 S.W.3d

176, 186 (Tex. 2022) (rejecting the argument that employees who report violations

of law as part of their jobs are not protected under a Texas Whistleblower Act);

*Lippman v. Ethicon, Inc.*, 119 A.3d 215, 230 (N.J. 2015) ("[W]e find no support in [the New Jersey Conscientious Employee Protection Act's] language, construction, or application in this Court's case law that supports that watchdog employees are stripped of whistleblower protection as a result of their position or because they are performing their regular job duties."); *Brown v. Mayor of Detroit*, 734 N.W.2d 514, 518 (Mich. 2007) ("[T]here is . . . no language in the [Michigan] statute that limits the protection of the [Michigan Whistleblowers Protection Act] to employees who report violations or suspected violations only if this reporting is outside the employee's job duties.").[10]  And after careful examination of the Hawaii statute and of relevant opinions on both sides of the question, the court adopts the view of these courts that reject an exception—indeed, in contrast, all the cases cited by Defendants stand on shaky ground.

Defendants rely heavily on *Klaus*, in which the U.S. District Court for the District of New Mexico applied then-existing New Mexico law and granted summary judgment in favor of an employer, reasoning in part that no whistleblowing occurred for an employee whose job duties "contemplated her familiarity with and identification of potential and/or actual violations of laws

---

[10]  *See also Pippin v. Boulevard Motel Corp.*, 835 F.3d 180, 183 (1st Cir. 2016) (reiterating that "no broad-based job duties exception" applies under the Maine Whistleblowers' Protection Act, and explaining that "although a particular employee's job duties may be relevant in discerning his or her actual motivation in reporting information, those duties are not dispositive of" whether an  employee engaged in protected activity) (quoting *Harrison v. Granite Bay Care, Inc.*, 811 F.3d 36, 51 (1st Cir. 2016)) (applying Maine law).

regarding government administration and reporting them to the Mayor."  2022 WL
4289952, at *10.  *Klaus* reasoned that the plaintiff "was not putting her job security
at risk for the benefit of the public, but instead was doing her job."  *Id.* (citing *Wills
v. Bd. of Regents of Univ. of N.M.*, 357 P.3d 453, 457 (N.M. App. 2015), and
reasoning that "whistleblower laws are designed to protect employees who risk
their own personal job security for the benefit of the public") (citation omitted).[11]

But *Wills*—the main support for that ruling in *Klaus*—appears to no
longer be good law in New Mexico on this point.  In 2023—after *Klaus* was
decided—the New Mexico Court of Appeals issued *Lerma v. State*, 541 P.3d 151
(N.M. App. 2023), which: (1) rejected the argument that a New Mexico
whistleblowing claim must be made "outside an employee's ordinary job duties,"
*id.* at 156; and (2) explicitly rejected *Wills*' reading of the New Mexico WPA, *see
id.* at 158 (finding *Wills* was "based on unsound reasoning" and was
"methodologically flawed").[12]  In short, *Lerma* undermines *Klaus*.

---

[11]  *Klaus* also cited to an unpublished decision of the New Mexico Court of Appeals,
*Kakuska v. Roswell Indep. Sch. Dist.*, 2019 WL 2103358 (N.M. Ct. App. Apr 16, 2019), for the
same proposition that "any public employee seeking the [New Mexico Whistleblower Act's]
protection must show evidence of a communication pertaining to a 'matter of public interest and
that the communication is not made primarily for the benefits of the employee, *or as part of the
employee's normal job responsibilities.*"  *Klaus*, 2022 WL 4289952, at *10 (quoting *Kakuska*,
2019 WL 2103358, at *4) (emphasis added).  In turn, *Kakuska* cited to *Wills* as support.  *See*
2019 WL 2103358, at *4.

[12]  The New Mexico Supreme Court granted certiorari in *Lerma* on December 28, 2023.
*See Lerma v. State*, 546 P.3d 1266 (N.M. Dec. 23, 2023) (table) (indicating that certiorari was
granted in No. S-1-SC-40126).  That appeal remains pending.

This reading is confirmed by *Mascarenas v. Village of Angel Fire, New Mexico*, 2023 WL 6391502 (D.N.M. Sept. 30, 2023), in which a more recent decision from the District of New Mexico rejected a "job duty" exception to the New Mexico WPA, reasoning as follows:

> Defendants further contend that Plaintiff's disclosures . . . fall outside of WPA's protection because his disclosures concerned communications he was required to make as part of his job as Chief Procurement Officer of the Village. . . . Citing to *Wills v. Board of Regents of University of New Mexico* as one of their main sources of authority, Defendants contend that the WPA does not protect communications that employees are required to make as part of their job responsibilities. 357 P.3d 453 (N.M. Ct. App. 2015) . . . . However, in *Lerma*, the New Mexico Court of Appeals recently rejected the *Wills* reading of the WPA, ruling that communications made through ordinary workplace channels or as part of an employee's normal work duties are not excluded from protection under the WPA. 2023 WL 5696175, at *1. In light of *Lerma*, the Court finds that all of Mascareñas['] alleged disclosures, regardless of whether they were made as communications he was required to make as part of his job, fall inside WPA's protection.

2023 WL 6391502, at *12.

Similarly, the other cases cited by Defendants—*Cottrell*, *Wolf*, and *Sasse*—have also been undermined. Those cases were all in some manner based on Federal Circuit opinions *Willis v. Department of Agriculture*, 141 F.3d 1139 (Fed. Cir. 1998), and *Huffman v. Office of Personnel Management*, 263 F.3d 1341 (Fed. Cir. 2001), which indeed held that the federal WPA did not apply to

employees with compliance duties, in part because reports of violations were not considered to be protected "disclosures."  *See Cottrell*, 2021 WL 741781, at *4–6 (citing *Willis* and *Huffman*, among other cases); *Wolf*, 2010 WL 5888778, at *10 (citing *Huffman*, among other cases); *Sasse*, 409 F.3d at 780 (applying *Willis* and *Huffman* to other federal whistleblower statutes).

　　　　*Willis* affirmed the dismissal of a federal WPA claim because "[p]art of Willis' job duties . . . was to review the conservation compliance of farms within his area," and so "[i]n reporting some of them as being out of compliance, he did no more than carry out his required everyday job responsibilities."  141 F.3d at 1144.  And *Huffman* expanded on *Willis*, finding "no clear evidence in the legislative history of the [federal] WPA . . . that the WPA was designed to trigger protection for performance of normal duties."  263 F.3d at 1353.  "The WPA was established to protect employees who go above and beyond the call of duty and report infractions of law that are hidden."  *Id.*

　　　　But Congress responded to *Willis* and *Huffman* with the Whistleblower Protection Enhancement Act of 2012 ("WPEA"), which amended the federal WPA in part "to clarify the disclosures of information protected from prohibited personnel practices."  Pub. L. 112-199, 126 Stat 1465 (Nov. 27, 2012).  *See, e.g.*, *Alguard v. Vilsack*, 2015 WL 667787, at *3 (E.D. Wash. Feb. 17, 2015) (explaining that Congress in the WPEA clarified that "a 'disclosure . . . made

24

during the normal course of duties of an employee' is a protected disclosure under
the Act.") (quoting Pub. L. No. 112-199 at § 101).  Specifically, 5 U.S.C.
§ 2302(f)(2) now provides:

> If a disclosure is made during the normal course of duties
> of an employee, the principal job function of whom is to
> regularly investigate and disclose wrongdoing (referred
> to in this paragraph as the "disclosing employee"), the
> disclosure shall not be excluded from subsection (b)(8)[13]
> if the disclosing employee demonstrates that an employee
> who has the authority to take, direct other individuals to
> take, recommend, or approve any personnel action with
> respect to the disclosing employee took, failed to take, or
> threatened to take or fail to take a personnel action with
> respect to the disclosing employee in reprisal for the
> disclosure made by the disclosing employee.

---

[13]  In turn, 5 U.S.C. § 2302(b)(8), in part, precludes retaliation by rendering it unlawful
for an employee to:

> take or fail to take, or threaten to take or fail to take, a personnel
> action with respect to any employee or applicant for employment
> because of—
>
> (A) any disclosure of information by an employee or applicant
> which the employee or applicant reasonably believes evidences—
>
>> (i) any violation of any law, rule, or regulation, or
>> (ii) gross mismanagement, a gross waste of funds, an abuse
>> of authority, or a substantial and specific danger to public
>> health or safety,
>>
>> if such disclosure is not specifically prohibited by law and
>> if such information is not specifically required by
>> Executive order to be kept secret in the interest of national
>> defense or the conduct of foreign affairs . . . .

The WPEA effectively nullified *Willis* and *Huffman* on the very
question whether a job-duty exception exists.  *See, e.g.*, *Lerma*, 541 P.3d at 157
("Congress has made clear that it never intended to exclude communications made
through normal channels or as part of ordinary duties, and Congress has amended
the federal statute to abrogate *Willis* on this point.") (citing 5 U.S.C. § 2302(f));
*Rittenberry v. Citizens Tri-Cnty. Bank*, 423 F. Supp. 3d 509, 519 (E.D. Tenn. 2019)
(declining to follow *Wolf* and *Sasse* because "Congress amended the
Whistleblower Protection Act in 2012—postdating both the *Wolf* and *Sasse*
decisions—to clarify that an employee is not excluded from whistleblower
protection because their 'disclosure is made during the normal course of duties.'")
(quoting 5 U.S.C. § 2302(f)(2)); *Daniels v. Merit Sys. Prot. Bd.*, 832 F.3d 1049,
1051–52 (9th Cir. 2016) ("In 2012, Congress amended the WPA. . . . Congress
identified and abrogated specific judicial decisions by the Federal Circuit that had
concluded that disclosures made in certain contexts (for example, during the course
of an employee's regular duties, or where the information disclosed was already
known) would not be eligible for WPA protection.");[14] *Leshinsky v. Telvent GIT,*

---

[14] *Daniels* further explained that:

> Congress concluded that such [Federal Circuit] decisions
> impermissibly narrowed the scope of the WPA and clarified that it
> "intend[ed] to protect 'any disclosure' of certain types of
> wrongdoing in order to encourage such disclosures" and "that the
>
> (continued . . . )

*S.A.*, 942 F. Supp. 2d 432, 449 (S.D.N.Y. 2013) ("In rejecting the Federal Circuit's narrow reading of the WPA, Congress made crystal clear its intent that *any* whistleblower who reports misconduct via one of the enumerated channels be protected under federal whistleblower statutes.").

Indeed, a recent opinion gave this very reason—intervening Congressional action—for rejecting a "job-duty" exception to a Louisiana whistleblowing statute. As the Louisiana Supreme Court reasoned,

> The job duty exception was created in *Willis*[]. Citing *Willis*, several federal cases perpetuated the exception. *See Sasse* [] and *Huffman* []. In 2012, amendments to 5 U.S.C. § 2302 clarified that these cases were wrongly decided. Congress emphasized the original intent of the WPA was to afford broad protection to all whistleblowing employees. By adding subsection (f)(2) to 5 U.S.C. § 2302, . . . Congress expressed that a job duty exception is contrary to the purpose of the WPA.

*Menard*, 366 So.3d at 1244. And so, *Menard* "interpret[ed] the similar language in [the Louisiana statute] consistent with Congress' interpretation of the WPA," and held that "[t]here is no job duty exception." *Id.*; *see also Lerma*, 541 P.3d at 156 (similar reasoning under New Mexico law).

---

protection for disclosing wrongdoing is extremely broad and will not be narrowed retroactively by future [Board] or court opinions."

832 F.3d at 1052 (quoting S. Rep. No. 112–155, at 5, 2012 U.S.C.C.A.N. at 593).

## 2.    The Language of HRS § 378-62 and Hawaii Case Law Supports Rejecting an Exception

Just as important, like statutes analyzed in other jurisdictions, the language of HRS § 378-62 itself supports a reading that rejects a compliance-duty exception to whistleblower protection.  The statute, quoted earlier, provides that "[a]n employer shall not discharge, threaten, or otherwise discriminate against an employee . . . ," but nothing in its plain language limits the types of "employees" who are protected, much less by job duty.[15]  Indeed, the statute protects an "employee" who "reports or is about to report *to the employer*, or reports or is about to report to a public body, verbally or in writing, a violation or a suspected violation of [law]."  HRS § 378-62(1) (emphasis added).

The Hawaii Legislature specifically added the clause "or is about to report *to the employer*" in 2002 "to expand the activities protected, under the Act, from reports made to public bodies to also include reports made to employers." *Lopes v. Kapiolani Med. Ctr. for Women & Children*, 410 F. Supp. 2d 939, 952 (D. Haw. 2005) (citing 2002 Haw. Sess. Laws, Act 56, § 5).  Although it did not

---

[15]  HRS § 378-61 defines "employee" as

> [A] person who performs a service for wages or other remuneration under a contract for hire, written or oral, express or implied.  Employee includes a person employed by the State or a political subdivision of the State.

and it defines a "person" as "an individual, sole proprietorship, partnership, corporation, association, or any other legal entity."

address whether a subset of employees (e.g., those with compliance duties) is

protected or not, the amendment specifically allowed protection for *internal* reports

by employees to their employers, clearly demonstrating an intent to *increase*

employee protections (not limit them).  And *Crosby* explains that "the HWPA

should be construed liberally to accomplish the purpose for which it was enacted."

76 Haw. at 342, 876 P.2d at 1310 (citing *Flores v. United Airlines, Inc.*, 70 Haw. 1,

12 n.8, 757 P.2d 641, 647 n.8 (1988)).  As to that purpose, *Crosby* emphasized that

"Legislative history confirms that the HWPA provides protection to employees

who report suspected violations of law from '*any form of retaliation* by their

employers.'"  *Id.* at 341, 876 P.2d at 1309 (quoting Sen. Stand. Comm. Rep. No.

1127, in 1987 Senate Journal, at 1392).

Finally, the Hawaii Supreme Court—albeit in an unpublished

memorandum decision—refused to decide whether an employee's "regular job

duties" could exclude that employee from having "participated" in protected

activity for purposes of a related provision of the HWPA, HRS § 378-62(2).[16]  In

*Tokashiki v. Frietas*, 110 Haw. 283, 132 P.3d 851, 2006 WL 995161 (2006)

(mem.), the employer (former Kauai County Police Chief George Freitas) argued

that his former secretary Jacquelyn Tokashiki's participation in a Police

---

[16]  Section 378-62(2) provides that an employer shall not retaliate against an employee
because "[a]n employee is requested by a public body *to participate* in an investigation, hearing,
or inquiry held by that public body, or a court action." (Emphasis added.)

Commission investigation was not protected activity under the HWPA because her "performance of . . . routine administrative and ministerial duties" or "regular job duties . . . cannot be considered 'participation' in an investigation."  2006 WL 995161, at *7.  Although the Hawaii Supreme Court "assum[ed], without deciding" that "Tokashiki's 'ministerial' participation was not protected conduct under the HWPA," it nevertheless upheld an HWPA claim based on more substantive participation, concluding that "Tokashiki's research, advice, and other involvement prior to initiation of the formal investigation would appear to constitute participation in an 'inquiry.'"  *Id.*  Nevertheless, the Hawaii Supreme Court hinted that an employee's "regular job duties" would not preclude an HWPA claim as a matter of law, stating:

> Freitas . . . fails to point to any authority to support the proposition that "routine administrative and ministerial duties" or "regular job duties" do not constitute protected activity, and as this court noted in *Crosby*, "the HWPA is a remedial statute.  As such, the HWPA should be construed liberally to accomplish the purpose for which it was enacted."  *Crosby*, 76 Hawai'i at 341–42, 876 P.2d at 1309–10 (citations omitted).

*Id*.

In short, given (1) the weight of case law in other jurisdictions that reject a "compliance job" exception to whistleblower claims, (2) the weaknesses in cases cited by Defendants, (3) the particular language of § 378-62, read in favor of employees as mandated by *Crosby*, and (4) the clues given in *Tokashiki*, the court

30

concludes that the Hawaii Supreme Court would reject a "compliance job" or "job duty" exception that would preclude a retaliation claim under the HWPA. Plaintiff may seek relief under the HWPA.

## D.    The Third Element: Causal Connection Between Protected Activity and Termination

Defendants next argue that Plaintiff cannot prove the causation element of the retaliation test under the HWPA. This element requires "a causal connection between the alleged retaliation and the 'whistleblowing.'" *Tagupa*, 125 F. Supp. 3d at 1119; *Chan*, 124 F. Supp. at 1055. To meet the causal connection requirement, an "employer's challenged action must have been taken 'because' the employee engaged in protected conduct." *Tagupa*, 125 F. Supp. 3d at 1119. As the Hawaii Supreme Court reiterated in *Crosby*, "an employee has the burden of showing that his or her protected conduct was a 'substantial or motivating factor' in the decision to terminate the employee." 76 Haw. at 342, 876 P.2d at 1310 (citation omitted). In this regard, "there is no required level of substantiality, . . . only that the employee's protected conduct 'played a role in the employer's action.'" *Griffin*, 654 F. Supp. 2d at 1131 n.20 (quoting *Crosby*, 76 Haw. at 342, 876 P.2d at 1310).[17] And "[c]ircumstantial evidence can be sufficient for

---

[17] "[T]he Hawaii Supreme Court has continued to use the 'causal link' standard," rather than a "but-for" causation standard later adopted for certain causes of action by the U.S. Supreme Court in *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 351 (2013). *See Fernandez v. FedEx Corp. Servs., Inc.*, 2021 WL 4305259, at *8 (D. Haw. Sept. 3, 2021) (citing cases)).

Plaintiff's showing on causation." *Sing v. Hawaiian Airlines, Inc.*, 2021 WL

5310896, at *12 (D. Haw. Nov. 15, 2021) (citing *Griffin*, 654 F. Supp. 2d at 1133

("Though an employee may always present direct evidence of motive, proximity in

time is one type of circumstantial evidence that is sufficient on its own to meet the

plaintiff's burden.")).

    Defendants argue that Plaintiff cannot show causation because he was

not terminated until May 1, 2015—which was some nine months after Plaintiff's

apparent last act of "protected activity," an August 19, 2014 report of

environmental problems regarding petroleum tainted soil. *See* ECF No. 100-1 at

PageID.904 ("Mr. Okamitsu and I then notified managers to ensure that

Defendants stopped hauling the petroleum soaked soil [which is a law violation]

. . . . The procedures and protocols for identifying Petroleum Contaminated Soil

(PCS) were not followed . . . ."); ECF No. 100-19 at PageID.1012 (emails).[18]

Defendants rely on a series of cases analyzing whether temporal proximity

between protected activity and adverse action is sufficient to establish a causal

connection. *See, e.g.*, *Kama*, 107 F.4th at 1061 (upholding determination that a 56-

day gap between protected activity and termination was not enough by itself to

---

[18] Defendants' Motion argues that the last act of protected activity was June 9, 2014, when Plaintiff sent an email explaining that the project was at risk due to environmental problems. *See* ECF No. 97-1 at PageID.718. But, as pointed out by Plaintiff, the record supports Plaintiff's argument that—at minimum—activity on August 19, 2014 (regarding the petroleum tainted soil), can be construed as a report constituting protected activity.

establish retaliation); *You v. Longs Drugs Stores Cal., LLC*, 937 F. Supp. 2d 1237,

1258 (D. Haw. 2013) ("Causation may be inferred when an adverse employment

action occurred 'fairly soon after the employee's protected expression.'") (quoting

*Villiarimo*, 281 F.3d at 1065); *Bassett*, 2020 WL 7351113, at *13 ("[W]hen the

time lag between the protected activity and adverse employment action is too great,

courts have 'found the absence of a causal link as a matter of law.'") (quoting *Pratt*

*v. Haw. Dep't of Pub. Safety*, 308 F. Supp. 3d 1131, 1147 (D. Haw. 2018)).  "As

this court has noted, a 'temporal distance of several months makes a causal link

more difficult to prove; a distance of five years severely undermines it.'"  *You*, 937

F. Supp. 2d at 1258 (quoting *Stucky v. State of Haw., Dep't of Educ.*, 2007 WL

602105, at *5 (D. Haw. Feb. 15, 2007)).

   Nevertheless, "the Ninth Circuit has cautioned courts against

engaging in a 'mechanical inquiry into the amount of time between the speech and

alleged retaliatory action.'"  *Id.* (quoting *Anthoine v. N. Central Counties*

*Consortium*, 605 F.3d 740, 751 (9th Cir. 2010)).  "There is no 'bright line' rule

providing that any particular period is always too long or always short enough to

support an inference."  *Id.* (citing *Coszalter v. City of Salem*, 320 F.3d 968, 977–78

(9th Cir. 2003)).  Whether an adverse employment action is intended to be

retaliatory

   is a question of fact that must be decided in the light of
   the timing and the surrounding circumstances.  In some

> cases, the totality of the facts may form such a clear
> picture that a district court would be justified in granting
> summary judgment, either for or against a plaintiff, on
> the issue of retaliatory motive; but the length of time,
> considered without regard to its factual setting, is not
> enough by itself to justify a grant of summary judgment.

*Coszalter*, 320 F.3d at 978.  This is because "if [courts] establish a per se rule that

a specified time period is too long to support an inference of causation, well-

advised retaliators will simply wait until that period has passed [and then] retaliate

with impunity."  *Id.*  Rather, "the inquiry is fact-specific and depends on both the

degree of proximity and what, if any, other evidence supports an inference of

[causation]."  *Kama*, 107 F.4th at 1059–60 (citing *Coszalter*, 320 F.3d at 978).  As

the Seventh Circuit has reasoned:

> [T]he fact that a year passed between [plaintiff's]
> protected expression and her termination does not mean
> that she cannot prove that retaliation caused her
> discharge; instead, it means that the timing of her
> discharge, in itself, does not support an inference of
> retaliation, and she must come forward with other
> evidence.

*Paluck v. Gooding Rubber Co.*, 221 F.3d 1003, 1010 (7th Cir. 2000) (citations

omitted).

     And here, there is "other evidence."  Much happened during the

approximately nine-month period between the August 19, 2014 report regarding a

petroleum contamination violation and Plaintiff's May 1, 2015 termination.  To

summarize—construing the evidence in Plaintiff's favor as required at this

summary judgment stage—during this period, Plaintiff did not work due to a work-related injury and had several administrative issues, including Kiewit's misfiling of Plaintiff's application for workers' compensation benefits, when he was also seeking information regarding Family and Medical Leave benefits.  In short—again, construing evidence in Plaintiff's favor—he was given "the runaround" by Kiewit during the nine-month gap when Kiewit knew Plaintiff was having insurance and treatment problems.  The evidence supports an inference that Kiewit had intended to terminate him much earlier than it did.  And as it turns out, he was terminated the same day that the Hawaii Department of Labor and Industrial Relations found he had suffered a work injury.

In September 2014, Plaintiff injured his back moving furniture while relocating to a different Kapolei-based Kiewit position (allegedly, a position with lesser pay and benefits).  A Kiewit manager discouraged Plaintiff from reporting the incident as a work injury because—Plaintiff was told—reporting it "could create some big problems for you."  ECF No. 100-1 at PageID.912.  After he reported the incident and inquired about a workers' compensation claim, Sharon Thom (a senior vice president from Kiewit) wrote to Plaintiff on October 17, 2014, telling him that he had violated Kiewit policy by not timely reporting a work injury and threatening him with "disciplinary action up to an including termination."

35

ECF No. 100-25 at PageID.1042.  Thom wrote Plaintiff again on October 21,

2014, that:

> [w]e believe that you were aware, or should have been
> aware, at the point you began experiencing discomfort
> and self treating that the Company should have been
> made aware of the issue.  As you know, it is imperative
> that any workplace injury or symptoms be reported to the
> Company immediately.

ECF No. 100-27 at PageID.1046.[19]

When Plaintiff told Kiewit on October 23, 2014, that he needed help

getting the workers' compensation insurance claim number to get needed medical

treatment, Thom simply responded that:

> [W]orkers' compensation claims are handled by a third
> party provider.  That provider reviews the claim and
> makes a determination on whether the claim is
> compensable, and if so, to what extent.  We must let the
> process run its course.

ECF No. 100-30 at PageID.1053.  Meanwhile, Kiewit had apparently filed

Plaintiff's workers' compensation claim with the wrong third-party provider.  ECF

No. 100-31 at PageID.1055; ECF No. 100-34; ECF No. 100-1 at PageID.916.  On

November 5, 2014, Plaintiff notified Jane Sewell of Kiewit of a processing error,

---

[19]  Thom, however, had been told on October 15, 2014, by a Kiewit manager that Plaintiff
was filing a workers' compensation claim after receiving MRI results, and that "he's been
keeping both Damon and Alika updated on his status."  ECF No. 98-22 at PageID.790.  And, in
fact, Plaintiff had been emailing Kiewit personnel (including "Damon" and "Alika") since as
least October 2, 2014, about his back pain and the ongoing results of the medical tests.  *See* ECF
Nos. 98-17 to 98-21.

and complained about needed medical treatment and unpaid bills because of the

error, ECF No. 100-31, but she did not respond.  ECF No. 100-1 at PageID.917.

The record contains no response to Plaintiff until a February 5, 2015, email from

Sewell.  *See* ECF No. 100-37 at PageID.1071.  The cryptic response from Sewell

was simply:

> Thank you for the email.  To verify, the work comp claim
> is being handled through the OCIP process.  I look
> forward to hearing from you with information from your
> doctor.

*Id.*  But, in addition to Plaintiff's prior emails, Kiewit had already been officially

told on January 27, 2015, by an insurance administrator, Sedgwick CMS, that

Kiewit had filed Plaintiff's claim with the wrong insurance carrier and thus his

claim had been denied.  *See* ECF No. 100-34 at PageID.1065; ECF No. 100-41 at

PageID.1079.  Plaintiff immediately responded to Sewell on February 5, 2015,

with an email asking:

> What does that mean?  "[T]he work comp is being
> handled through the OCIP process?"  I filed the claim
> several months ago, and verified with you in November
> that Sedgwick was the carrier.  I've already gone to the
> independent medical evaluation.  The department of
> labor has already set a hearing date.  Why are there all of
> a sudden these changes?  Please explain.

ECF No. 100-38 at PageID.1073.

Meanwhile, on January 26, 2015, Sewell had written to Plaintiff,

listing the "essential functions of an engineering position," and asking him for:

> clarification about (a) when you will be released to return
> to work; (b) what restrictions, if any, are placed upon
> your ability to perform the essential functions of an
> engineering position; and (c) if there are any restrictions,
> we need your physician to clarify which of the
> aforementioned restrictions are permanent and which are
> temporary.

ECF No. 100-33 at PageID.1062.  She also asked for "any and all ideas which you

may have about how you might be able to return to work in a safe and effective

manner."  *Id.*  Plaintiff responded on February 4, 2015, telling Sewell:

> I have spoken to the doctor and he will be providing
> responses to your questions.  Also, in regards to my
> Workmans comp claim, I just received a notice from
> Sedgwick stating that after all this time they have now
> discovered that they are not the insurance carrier . . . ?
> Something about OCIP being enacted from 8/19/14 under
> HART and being covered under Old Republic Insurance
> Corporation Policy A1LWF5261400???  Can you please
> provide me some insight on this?  I thought this was
> clarified back in November.

ECF 100-36 at PageID.1069.

On March 25, 2015, Plaintiff wrote another email to Sewell,

explaining some of his insurance and medical issues, and that he has been

receiving temporary disability benefits, and providing some medical

documentation of his condition.  ECF No. 100-42 at PageID.1082.

During all this time, Plaintiff had not been working, and on April 9,

2015, Sewell offered Plaintiff a separation, which included a severance payment of

$20,000, in exchange for a waiver and release.  ECF No. 100-43 at PageID.1084.

The letter included a listing of all of Plaintiff's "14 out-of-work extensions" due to "inability to return to work since September 26, 2014." *Id.*  Plaintiff did not accept the proposed severance agreement.

On April 30, 2015, the DLIR issued a determination in an ongoing workers' compensation proceeding that found Plaintiff had suffered a work injury on September 19, 2014.  ECF No. 100-44 at PageID.1090.  The DLIR found that his workers' compensation claim was compensable, and that he was awarded disability benefits from October 2014 through March 3, 2015.  *Id.* at PageID.1092.  That same day, Kiewit terminated Plaintiff, effective on May 1, 2015.  ECF No. 98-29 at PageID.812–813.

Construing this evidence in the light most favorable to Plaintiff, the record supports a conclusion that Kiewit had *already* decided—well before April 30, 2015—that it was going to terminate Plaintiff.  That is, there is enough evidence to support an inference of causation for purposes of the prima facie case.  *See Kama*, 107 F.4th at 1059 (reiterating that "[u]nder the *McDonnell Douglas* framework, the requisite degree of proof necessary to establish a prima facie case on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence") (ellipses and emphasis omitted) (quoting *Opara*, 57 F.4th at 722).  In sum, Plaintiff has made a prima facie showing of causation when considering not only the proximity of termination (or lack thereof) to

protected activity, but also the "totality of the facts" and the "surrounding circumstances" of the termination and "its factual setting." *Coszalter*, 320 F.3d at 978.

### E.    Pretext

Plaintiff having established a prima facie case of retaliation, at the next step of the *McDonnell Douglas* framework, Defendants have proffered a legitimate, non-discriminatory reason for termination—Plaintiff's multiple absences from work and corresponding inability to perform his job as an engineer. *See* ECF No. 98-29 at PageID.812; ECF No. 97-1 at PageID.728–730; *see also* ECF No. 105-1 at PageID.1141–1142.  Defendant's termination letter now listed 15 "out-of-work extensions" and told him:

> Our current understanding is that your leave is indefinite.
> We continue to have your best interest in mind, but given
> your open ended request for time off, and your last
> known restrictions (apart from being unable to return to
> work) exclude you from virtually every position with the
> Company, the Company extended you a separation
> offer. . . . As of the date of this letter, I still have not
> received a response from you; therefore, your
> employment with Kiewit will be terminated as of May 1,
> 2015.

ECF No. 98-29 at PageID.812–813.

The question under *McDonnell Douglas* is whether Plaintiff can meet his corresponding burden to show that the reasons given for the termination are pretextual.  A plaintiff can establish pretext "(1) directly, by showing that unlawful

discrimination more likely [than not] motivated the employer; [or] (2) indirectly,

by showing that the employer's proffered explanation is unworthy of credence

because it is internally inconsistent or otherwise not believable; or via a

combination of the[se] two kinds of evidence." *Kama*, 107 F.4th at 1059 (quoting

*Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1127 (9th Cir. 2000)).

And, "[a]t the pretext stage, the plaintiff's burden remains low, and "very little[ ]

evidence is necessary to raise a genuine issue of fact regarding an employer's

motive." *Id.* (quoting *Opara*, 57 F.4th at 723–24). "Nevertheless, a plaintiff must

present some evidence that goes to the defendant's motivation—either by directly

showing that it was discriminatory or by contesting the defendant's claimed

motivation." *Id.*

   Plaintiff points to evidence that Kiewit supervisors had specifically

told him not to report environmental incidents. *See, e.g.*, ECF No. 100-1 at

PageID.886-87 (Kiewit supervisor Brent Scheele asking Plaintiff, "How much

money do we have to lose to make it acceptable to you to be out of compliance just

for a little while?"); *id.* at PageID.894 (Kiewit instructing Ho "to keep my

comments regarding illegalities to myself"); ECF No. 100-13 at PageID.985

(Kiewit out-of-state district manager agreeing with Ho about environmental

violations after an investigation); ECF No. 100-1 at PageID.898 (testimony that the

district manager was told by Kiewit to delete the report and submit a redacted

version).  This evidence, if believed—even assuming if does not rise to a level of direct evidence of discrimination—supports a showing of pretext by showing Defendants' motivation.  But Plaintiff mostly relies on the strength of the evidence supporting a showing of causation at the prima facie stage—the same evidence that supports an inference that Kiewit had *already* decided to terminate him (well before his actual termination date), and thus were using his continuing absences as a pretextual reason to retaliate.  *See Griffin*, 654 F. Supp. 2d at 1134 ("In other words, a reasonable inference can be made that Defendant . . . may have already planned on terminating Plaintiffs, but waited until the government requested their removal in order to disguise its retaliatory motivation.").

This is a proper method of showing pretext, given the evidence here. *See, e.g.*, *Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 732 (9th Cir. 1986) ("To show pretext, the plaintiff is not necessarily required to introduce evidence beyond that already offered to establish her prima facie case, although she may of course provide additional proof of the defendants' unlawful motivation.") (citing *Tex. Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 255 n.10 (1981)); *Yartzoff v. Thomas*, 809 F.2d 1371, 1377 (9th Cir. 1987) ("Evidence already introduced to establish the prima facie case may be considered [in analyzing pretext].").  As courts have reiterated, "[t]emporal proximity can support *both* a prima facie case of retaliation and a showing of pretext." *Kama*, 107 F.4th. at 1059 (emphasis added)

(citing *Miller*, 797 F.2d at 731–32); *Chan*, 124 F. Supp. 2d at 1057 (observing that

"Judge J. Michael Seabright of this court has recognized that the timing of adverse

employment actions can sometimes suffice as circumstantial evidence for both a

prima facie case and evidence of pretext.") (citing *Patrick v. 3D Holdings, LLC*,

2014 WL 1094917, at *11 (D. Haw. Mar. 18, 2014)).

And here, given the combination of evidence of discriminatory

animus and the evidence of causation, the court concludes that Plaintiff has met his

"low" burden to demonstrate pretext. *See Kama*, 107 F.4th at 1059. At this point,

"the *McDonnell Douglas* framework 'disappears,' and 'the sole remaining issue is

discrimination *vel non.*'" *Villiarimo*, 281 F.3d at 1062 (brackets omitted) (quoting

*Reeves*, 530 U.S. at 143). "This burden [to show pretext] thus merges with the

plaintiff's ultimate burden of persuading the court that he is the victim of

retaliation." *Yartzoff*, 809 F.2d at 1377 (citing *Burdine*, 450 U.S. at 256).

Applying the framework to Plaintiff's HWPA claim, the court DENIES

Defendants' Motion for Summary Judgment.

///

///

///

///

///

43

## V. **CONCLUSION**

For the foregoing reasons, Defendants' Motion for Summary

Judgment is DENIED.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, March 11, 2025.



 /s/ J. Michael Seabright
J. Michael Seabright
Chief United States District Judge